1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| C. F., *et al.*, | CASE NO: SACV 07-1434 JVS (ANx) |
| Plaintiffs, | FINAL ORDER RE MOTIONS FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION |
| v. |  |
| CAPISTRANO UNIFIED SCHOOL DISTRICT, *et al.*, |  |
| Defendants. |  |

I.     BACKGROUND

Plaintiff C.F., by and through his parents Bill Farnan and Teresa Farnan, (collectively, "Farnan"), asserts a claim for relief for violation of his First Amendment rights by the Capistrano Unified School District ("District") and Dr. James C. Corbett ("Corbett") (collectively, "School Defendants").  On April 28, 2008, this Court granted a motion allowing the California Teachers Association

1

("CTA") and Capistrano Unified Education Association ("CUEA"),
(collectively, "Unions"), to intervene as defendants in the action.  (Docket No. 29.)
Farnan asserts that his rights under the Establishment Clause have been violated by
a practice and policy hostile toward religion and favoring irreligion over religion.
(First Amended Complaint ("FAC") ¶¶ 22, 25.)  At the focus of the dispute are
remarks made by Corbett in his Advanced Placement European History class.  (Id.
at ¶¶ 14-15.)

    Farnan, the School Defendants, and the Unions have filed separate cross-
motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.[1]
All motions are opposed.

II.   LEGAL STANDARD

    Summary judgment is appropriate only where the record, read in the light
most favorable to the non-moving party, indicates that "there is no genuine issue as
to any material fact and . . . the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).
Material facts are those necessary to the proof or defense of a claim, and are
determined by reference to substantive law.  Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 248 (1986).  A factual issue is genuine "if the evidence is such that a

---

    [1] The Unions have specified that they are moving for summary adjudication
in the alternative.  In addition, despite the School Defendants' argument, the Court
finds that Farnan's motion was filed in a timely manner.  (See School Defendants'
Opp. p. 5.)  Farnan filed the motion on March 9, 2009, which was Farnan's last day
to file the motion.  (Docket No. 47.)

2

reasonable jury could return a verdict for the nonmoving party."  Id.  In deciding a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. at 255.

The burden initially is on the moving party to demonstrate an absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  "However, if the nonmoving party bears the burden of proof on an issue at trial, the moving party need not produce affirmative evidence of an absence of fact to satisfy its burden."  In re Brazier Forest Prod., Inc., 921 F.2d 221, 223 (9th Cir. 1990).  Rather, it "may simply point to the absence of evidence to support the nonmoving party's case."  Id.  If and only if the moving party meets its burden, then the non-moving party must produce enough evidence to rebut the moving party's claim and create a genuine issue of material fact.  Celotex, 477 U.S. at 322-23.  If the non-moving party meets this burden, then the motion will be denied.  Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc., 210 F.3d 1099, 1103 (9th Cir. 2000).

Where the parties have made cross-motions for summary judgment, the Court must consider each motion on its own merits.  Fair Hous. Council v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001).  The Court will consider each party's evidentiary showing, regardless of which motion the evidence was tendered under.  Id. at 1137.

III.   DISCUSSION

The United States Constitution prohibits any law "respecting an establishment of religion."  U.S. Const. Amend. I.  The parties agree that the appropriate test for determining whether Corbett's statements were permissible under the Establishment Clause is found in Lemon v. Kurtzman, 403 U.S. 602

(1971).  (<u>See</u> Farnan's Mot. p. 14.; Unions' Mot. p. 3; School Defendants' Mot. p. 11.)  There, the Supreme Court established a three-pronged standard in its review of Pennsylvania and Rhode Island statutes:

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion.

<u>Lemon</u>, 403 U.S. at 612-13 (internal quotation marks and citations omitted). Permissible conduct must satisfy all three requirements.  <u>Edwards v. Aguillard</u>, 482 U.S. 578, 583 (1987);  <u>Vernon v. City of Los Angeles</u>, 27 F.3d 1385, 1396-97 (9th Cir. 1994).

Here, Farnan contends that Corbett violated the Establishment Clause by making comments hostile to religion and to Christianity in particular.[2]  (Farnan's

---

[2]  Farnan also refers to the concept of a "religion of secularism" at various points in his motion.  (<u>See</u> <u>e.g.</u>, Farnan's Mot. p. 20.)  The Supreme Court has found that "the State may not establish a 'religion of secularism' in the sense of affirmatively opposing or showing hostility to religion."  <u>School Dist. of Abington Tp., Pa. v. Schempp</u>, 374 U.S. 203, 225 (1963).  This is simply another way of saying that the state may not affirmatively show hostility to religion.  To the extent that Farnan is arguing that Corbett may not put forth secular ideas because he would be creating a "secular religion," Farnan's argument fails.  The Ninth Circuit has found that "neither the Supreme Court, nor this circuit, has ever held that

4

Mot. p. 1.)  "Although <u>Lemon</u> is most frequently invoked in cases involving alleged governmental preferences to religion, the test also 'accommodates the analysis of a claim brought under a hostility to religion theory.'"  <u>Vasquez v. Los Angeles ("LA") County</u>, 487 F.3d 1246, 1255 (9th Cir. 2007) (quoting <u>Am. Family Ass'n, Inc. v. City and County of San Francisco</u>, 277 F.3d 1114, 1121 (9th Cir. 2002)).  There is no question that "[t]he government neutrality required under the Establishment Clause is . . . violated as much by government disapproval of religion as it is by government approval of religion."  <u>Vernon</u>, 27 F.3d at 1396. Thus, the Court must apply the <u>Lemon</u> test to determine whether Corbett made statements in class that were improperly hostile to or disapproving of religion in general, or of Christianity in particular.

     A.    <u>Separating the Grain from the Chaff</u>

Farnan quotes Corbett on a wide range of topics, only some of which intersect the First Amendment.  In this Section, the Court isolates those statements which clearly do not violate the Establishment Clause before turning to the <u>Lemon</u> analysis.[3]

_____

evolutionism or secular humanism are 'religions' for Establishment Clause purposes."  <u>Peloza v. Capistrano Unified School District</u>, 37 F.3d 517, 521 (9th Cir. 1994).

[3]   The Court will refer to all of Corbett's <u>alleged statements</u> from the recordings simply as Corbett's <u>statements</u> throughout this motion for the sake of simplicity.  The Court recognizes that the School Defendants claim that some of

1.      <u>Statements or Opinions Not Touching Upon Religion</u>

First, the Court notes that Farnan, in both the FAC and in his briefs, points to numerous statements allegedly made by Corbett which do not touch upon or mention religion.  (<u>See e.g.</u> FAC ¶¶ 15d, e, h; Farnan's Mot. p. 6, ¶¶ b, c.)  Farnan presents these statements as evidence that Corbett made comments hostile to or disapproving of religion.

For example, Farnan points to Corbett's comments regarding the availability of birth control pills at middle school health centers.  (FAC ¶ 15e.)  Corbett's statements suggest that Corbett believes that abstinence-only policies do not work.  (Id.)  None of the statements which do not touch upon religion, however, fail to satisfy the <u>Lemon</u> test and, therefore, do not violate the Establishment Clause.  Nor can these statements support an interpretation that Corbett's other statements demonstrate hostility or disapproval of religion.  The statements do not mention, let alone criticize religion.[4]

_____

the CDs and/or transcripts have been edited.  (<u>See</u> School Defendants' Mot. p. 9.)

[4] Many of these statements are more properly construed as espousing what many would term "liberal," rather than "conservative," viewpoints.  Whether Corbett may espouse "liberal" as opposed to "conservative" viewpoints in the classroom is not at issue in this action and is not relevant to a claim pursuant to the Establishment Clause.  Moreover, Farnan's suggestion that Corbett should not spend class time discussing current events in an AP European History Course is not relevant to the Establishment Clause claim.  The Court notes, however, that it is not unreasonable for a history teacher to illustrate historical points with

A statement by a government official does not violate the Establishment Clause merely because a particular religious group may find the official's position incorrect or offensive.  Such a finding would require a teacher to tailor his comments so as not to offend or disagree with any religious group.  This would be unworkable given the number of different religious viewpoints on various issues.  This would also be directly contrary to the fundamental principles of Establishment Clause jurisprudence because it would require a teacher to attempt to teach in accordance with certain religious principles.

Well-established case law also reinforces this point.  In <u>Smith v. Board of School Comm'rs of Mobile County</u>, 827 F.2d 684, 693 (11th Cir. 1987), the court held that the fact that certain religious individuals found some of the material in school textbooks offensive was not "sufficient to render use of th[e] material in the public schools a violation of the establishment clause."  The court further noted that:

> [G]iven the diversity of religious views in this country, if the standard were merely inconsistency with the beliefs of a particular religion there would be very little that could be taught in the public schools.  As Justice Jackson has stated:  Authorities list 256 separate and substantial religious bodies to exist in the . . . United States. . . . <u>If we are to eliminate everything that is objectionable to any of these warring sects or inconsistent with any of their doctrines, we will leave public education in shreds</u>.  Nothing but educational confusion and a discrediting of the public school system can result . . . .

references to the modern world.

7

Id. at 693 n.10 (quoting McCollum v. Board of Ed., 333 U.S. 203, 235 (1948) (Jackson, J., concurring)) (emphasis supplied).

Likewise, in Epperson v. State of Ark., 393 U.S. 97, 89 (1968), the Supreme Court struck down Arkansas statutes forbidding the teaching of evolution in public schools and in colleges and universities, finding that the statutes violated the Establishment Clause. The Court found that the statutes were unconstitutional even if they merely prohibited teachers from stating that the theory of evolution is true. Id. at 102-03. This was so even though the theory was contrary "to the belief of some that the Book of Genesis must be the exclusive source of doctrine as to the origin of man." Id. at 107. The Court found that "[t]here is and can be no doubt that the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma." Id. at 106 (emphasis supplied). The Court also noted that "the state has no legitimate interest in protecting any or all religions from views distasteful to them." Id. at 107 (citing Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 505 (1952)).

Thus, Corbett's in-class opinions on various social or political issues not touching upon religion do not violate the Establishment Clause, regardless of whether those of a particular religious faith might disagree with or find his statements offensive. Therefore, any of Corbett's statements which do not touch upon or mention religion satisfy the Lemon test and do not violate the Establishment Clause.

2.    Statements or Opinions Touching Upon Religion

The Court finds that several of Corbett's statements in the record which do

8

touch upon or mention religion are clearly not in violation of the Establishment Clause, nor do they shed light on the nature of other statements.  For example, Farnan points to the following statements that Corbett made during the fall 2007 semester:

> What do you think of somebody who thinks it's necessary to lie in order to make a religious point? . . . And um, this kid is in the class, and, as I say, a Christian fundamentalist kid who wanted to be a minister. . . . And, um, he was actually set on going – I mean, if your parents go there, please, you know, don't be too insulted.  But he wanted to go to Biola, which is the Bible Institute of Los Angeles, and truly, as far as colleges go, it's the – it is the college which George Bush is being assigned to (inaudible), and it is the college that has no academic integrity whatsoever.  And it is a fundamentalist Christian school.  I think, a college that has basically one book.

(Mot. pp. 5-6; Farnan's Ex. B, pp. 36-38.)

After listening to the recording and reviewing the transcript, the Court notes that Farnan leaves out the following important statements from the above discussion.  Corbett stated that the "kid who wanted to be a minister" (the "student") was "absolutely brilliant."  (Farnan's Ex. B, p. 36.)  Corbett also stated that, in response to his question about whether it is necessary to lie to make a religious point, the student gave an answer that almost caused Corbett to tear up because "it was so dead on."  (Id. at 38.)  Corbett stated that he knew the answer would be right because he knew the student was a Christian fundamentalist.  (Id.)  The student stated, "I don't think the message of Jesus Christ needs any help from liars."  (Id.)  Corbett then explained on the recording that he said, "Yeah, right.

You figured it out, you know, who-hoo."  (<u>Id.</u>)  These statements are respectful and, if anything, approving of the Christian student and his religious views.

In addition, after stating that he thought Biola had no "academic integrity," Corbett explained that he and another faculty member, Tandiary, who was a minister and a fundamentalist Christian, "conspired" to try to prevent the student from going to Biola.  (<u>Id.</u>)  Corbett then stated that if the student went to a Christian theology seminary or Harvard, then he would be "truly educated."  (<u>Id.</u>)  In context, Corbett makes clear that he does not hold Biola in high regard because of his view of its academics, and not because it is a Christian fundamentalist school.  No reasonable juror could find otherwise given that Corbett speaks highly of attending a Christian theology seminary in the same conversation.

Similarly, Corbett's statements regarding the Boy Scouts satisfy the <u>Lemon</u> test and do not violate the Establishment Clause.  Corbett stated:

> Now, the Boy Scouts have said, unless you're willing to love God, and unless you're willing to – unless you're not gay, um – they are saying, being gay excludes you.  Not believing God or not professing a belief in God also excludes you . . . But you see, until they started these rules, Boy Scouts used to – or Boy Scout troops usually met at schools, and places like that, parks, government buildings.  They can't do that anymore.  They can't do that anymore, because now they are, in their own mind, a homophobic and a racist organization.  It's that simple. . . . <u>It's call[ed] separation of church and state</u>.  The Boy Scouts can't have it both ways.  If they want to be an exclusive, Christian organization or an exclusive, God-fearing organization, then they can't receive any more support from the state, and shouldn't.

10

(Farnan's Mot. p. 3; Farnan's Ex. A, p. 4 (emphasis supplied).)

Here, Corbett is expressing his disapproval of what he perceives to be a violation of separation of church and state.[5]  Corbett's statements endorsing the principle of separation of church and state do not indicate hostility towards religion.  Having the utmost respect for religion and a strong belief in separation of church and state are not mutually exclusive.  The Supreme Court has held that the separation of church and state mandated by the First Amendment "rests upon the premise that both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere. . . . [T]he First Amendment ha[s] erected a wall between Church and State which must be kept high and impregnable."  McCollum, 333 U.S. at 212.  Corbett cannot be found to violate the Establishment Clause for endorsing a principle set forth by the Supreme Court or for voicing his opinion that the Boy Scouts have violated this principle.

Moreover, Corbett's statements referring to the Boy Scouts as a "homophobic and racist organization" do not violate the Establishment Clause.  In American Family Association, Inc., 277 F.3d at 1118, the Ninth Circuit found that a local government's formal disapproval of an advertising campaign sponsored by religious groups did not violate the Establishment Clause.  The advertising

_____

[5]  Likewise, in his statement excerpted on page 10 of Farnan's motion, paragraph (n), Corbett is primarily discussing his view that religious groups should not be exempt from paying taxes.  This is not necessarily hostile to religion and is more properly construed as further discussion of Corbett's views on separation of church and state.

11

campaign espoused the view that "homosexuality is a sin and that homosexuals could change their sexual orientation." Id.  The San Francisco Board of Supervisors sent a letter to the plaintiffs stating, in part, that at least one supervisor "denounces your hateful rhetoric against gays, lesbians, and transgendered people." Id.  The court reasoned that the documents, read as a whole, were "primarily geared toward promoting equality for gays and discouraging violence against them."  Id.  Thus, government officials may attempt to promote tolerance and equality by criticizing perceived intolerance and discrimination without violating the Establishment Clause.  To hold otherwise would lead to absurd results.  Here, the Court finds that Corbett's statements regarding the Boy Scouts' policies are primarily geared toward espousing tolerance and non-discrimination, as well as separation of church and state.  Therefore, Corbett's statements regarding the Boy Scouts do not violate the Establishment Clause.[6]

Having resolved the more clear-cut issues above, the Court now turns to examine the primary statements at issue in this case.  These statements require the Court to look more closely at the three-pronged Lemon test.  Permissible conduct must satisfy all three requirements.  Edwards, 482 U.S. at 583;  Vernon, 27 F.3d at 1396-97.

---

[6]  Similarly, the Court also finds that Corbett's statements pointed out in Farnan's motion, pp. 8-9, ¶¶ i, j, & l, do not violate the Establishment Clause or give weight to Farnan's argument.  These statements primarily espouse separation of church and state.  In addition, the Court notes that Corbett's statement about his "one religious belief" appears to be, at least in part, respectful of religion given that Corbett is telling the students that he has at least one religious belief.

B.    <u>The Lemon Analysis</u>

Before turning to the three-pronged analysis, the Court sets forth the standard for reviewing Corbett's statements.  After reviewing the parties' supplemental briefs on this issue and having considered the case law, the Court concludes that it is the Court's role to determine whether the statements, which in the main are not contested, meet the requirements of each <u>Lemon</u> prong.

The Ninth Circuit recently held that "[w]hether there has been an Establishment Clause violation is a question of law."  <u>Vasquez</u>, 487 F.3d at 1254 (citation omitted).  Likewise, in a concurring opinion in <u>Lynch v. Donnelly</u>, Justice O'Connor explained that:

> [W]hether a government activity communicates endorsement of religion is not a question of simple historical fact.  Although evidentiary submissions may help answer it, the question is, like the question whether racial or sex-based classifications communicate an invidious message, in large part a legal question to be answered on the basis of judicial interpretation of social facts.

<u>Lynch v. Donnelly</u>, 465 U.S. 668, 694 (1984) (O'Connor, J., concurring).

It stands to reason that if the question of whether a government activity communicates endorsement of religion is primarily a legal question, then the question of whether a government activity communicates disapproval of religion is also largely a legal question.  There are few disputed historical facts in this case.  This action is primarily based on Corbett's recorded statements.  Thus, the Court will examine the statements to determine whether they satisfy the three-prongs of

13

the Lemon test.[7]

### 1.      Secular Purpose

The first prong of the Lemon test is satisfied if the challenged action has a secular purpose. Lemon, 403 U.S. at 612-13. The Ninth Circuit has stated that "[a] practice will stumble on the purpose prong 'only if it is motivated wholly by an impermissible purpose.'" Am. Family Ass'n, Inc., 277 F.3d at 1121. The court in American Family Association also recognized that in Vernon, the court acknowledged "precedent that any secular purpose suffices, but not[ed] that [the Ninth Circuit panel] believes [the] Supreme Court test is really that the 'actual' or 'primary' purpose must be secular." Id. (citing Vernon, 27 F.3d at 1397). In addition, "[w]hile we must 'distinguish a sham secular purpose from a sincere one,' we should also be 'reluctant to attribute unconstitutional motives to the [government].'" Vasquez, 487 F.3d at 1255 (citing Am. Family Ass'n, 277 F.3d at 1121; McCreary County, Ky. v. Am. Civil Liberties Union of Ky., 545 U.S. 844, 864 (2005); Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 308 (2000); Mueller v. Allen, 463 U.S. 388, 394-95 (1983)). "Unless it seems to be a sham, moreover, the government's assertion of a legitimate secular purpose is entitled to deference. We must be cautious about attributing unconstitutional motives to state officials." Chaudhuri v. State of Tenn., 130 F.3d 232, 236 (9th Cir. 1997).

---

[7] Although the Court addresses Corbett's statements individually throughout this opinion, the Court finds that the outcome does not change when each statement is viewed in light of the other statements, or when all the statements are viewed together.

14

Farnan argues that Corbett's "only purpose in making these statements is to make sure that the students who sit before him as a captive audience understand that religion is irrational." (Farnan's Mot. p. 15.) The Unions respond that Corbett's statements were made for the purpose of teaching European history and deductive reasoning. (Unions' Opp. pp. 6-7.)

*The Peloza Comment*

The Court turns first to Corbett's statement regarding John Peloza ("Peloza"). (Farnan's Ex. I, pp. 222-25.) This statement presents the closest question for the Court in assessing secular purpose. Peloza apparently brought suit against Corbett because Corbett was the advisor to a student newspaper which ran an article suggesting that Peloza was teaching religion rather than science in his classroom. (Id.) Corbett explained to his class that Peloza, a teacher, "was not telling the kids [Peloza's students] the scientific truth about evolution." (Id.) Corbett also told his students that, in response to a request to give Peloza space in the newspaper to present his point of view, Corbett stated, "I will not leave John Peloza alone to propagandize kids with this religious, superstitious nonsense." (Id.) One could argue that Corbett meant that Peloza should not be presenting his religious ideas to students or that Peloza was presenting faulty science to the students. But there is more to the statement: Corbett states an unequivocal belief that creationism is "superstitious nonsense." The Court cannot discern a legitimate secular purpose in this statement, even when considered in context. The statement therefore constitutes improper disapproval of religion in violation of the Establishment Clause.

*The Mark Twain Quote*

15

Corbett's quotation of Mark Twain also requires close scrutiny.  Corbett stated, "What was it that Mark Twain said? 'Religion was invented when the first con man met the first fool.'"  (Farnan's Ex. D, p. 75.)   The remark comes as part of a historical discussion of the tension between religion and science.  Corbett contrasted science's continuing search for "rational" explanations when one explanation proves insufficient as opposed to stopping the inquiry in favor of "magic."  (Id.)   Notwithstanding the biting nature of Twain's observations, and this one in particular, it illustrates a turn to the non-rational when man cannot, or is unable, to develop a rational solution.[8]  Moreover, it is not clear that Corbett was espousing Twain's view rather than merely quoting it.  In context, the Court cannot say that the primary purpose of the quote was to disparage, and thus it does not violate the First Amendment.

After careful review of the other statements at issue in the case, and in light of the standard that deference should be given to the government's assertion of a legitimate secular purpose, the Court finds that Corbett's primary purpose in making the remaining statements at issue was to teach the students about European history, current world events, and deductive reasoning in preparation for the AP European history exam.

*"Jesus Glasses."*

For example, in one of Corbett's lectures he stated, "when you put on your Jesus glasses, you can't see the truth."  (Farnan's Ex. A, p. 25.)  However, this statement was made in the context of a discussion about how certain peasants did

---

[8]  The Court uses the term "rational" here only to mean that which can be tested by generally accepted scientific principles.

16

not support Joseph II's reforms for religious reasons, even though the reforms were in the peasants' best political and economic interests.  (<u>Id.</u> at 24-25.)  Corbett also seemed to be making a general point that people sometimes make choices that are against their best interests for religious reasons and that religion has and can be used as a manipulative tool.  (<u>Id.</u>)  He further suggested that in order to create social change and "overturn long-held traditions overnight without causing chaos" you need to first work to gather support for your position.  (<u>Id.</u> at 25.)

The "Jesus glasses" phrase, standing alone, could be read as a general assertion that all people who believe in Jesus cannot see the truth.  However, given the context of the discussion and given that "[w]e must be cautious about attributing unconstitutional motives to state officials," the Court declines to attribute such an overly-broad and improper purpose to the phrase for purposes of this motion.  <u>See</u> <u>Chaudhuri</u>, 130 F.3d at 236.  One cannot say that Corbett's primary purpose here was to criticize Christianity or religion.  The Court finds that, given the context, Corbett's primary purpose was to illustrate the specific historical point regarding the peasants in the discussion and to make the general point that religion can cause people to make political choices which are not in their best interest.  Although the Court offers no opinion on the validity of these concepts, the Court notes that these views are not necessarily hostile to religion and are relevant concepts for discussion in an AP European history course.[9]

---

[9] Farnan concedes that the recommended topics set forth by the College Board include "the development of changes in religious thought and institutions and changes in elite and popular culture, such as the development of new attitudes toward religion, the family, work, and ritual."  (Farnan's Reply p. 7.)  This presumably includes the effect that religion has had over social and political

17

On this prong, therefore, the Court finds that Farnan is entitled to summary adjudication against Corbett with respect to the Peloza statement.[10]  The School Defendants and the Unions are entitled to summary adjudication on all other statements.

2.    Primary Effect

The second prong of the Lemon test is satisfied if the principal or primary effect of the challenged action is one that neither advances nor inhibits religion. Lemon, 403 U.S. at 612-13.  "A government practice has the effect of impermissibly advancing or disapproving of religion if it is 'sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the non-adherents as a disapproval, of their individual religious choices.'" Brown v. Woodland Joint Unified School Dist., 27 F.3d 1373, 1378 (9th Cir. 1994) (citing School Dist. of Grand Rapids v. Ball, 473 U.S. 373, 390 (1985)).  "We conduct this inquiry from the perspective of a 'reasonable observer,' who is both informed and reasonable."  Am. Family Ass'n, Inc., 277 F.3d at 1121.  This is an objective, not a subjective, standard.  Brown, 27 F.3d at 1379.  The Ninth Circuit has explained that "[p]eople may take offense at all manner of religious as well as nonreligious messages.  If an Establishment Clause violation arose each time a student believed that a school practice either advanced or disapproved of a religion, school curricula would be reduced to the lowest common denominator, permitting each student to become a 'curriculum review committee' unto himself or herself." Id.

_____

choices.

[10]  The Court discusses the District's liability in a separate section below.

18

In <u>Vasquez</u>, the Ninth Circuit recently addressed an alleged violation of the Establishment Clause in a hostility to religion context.  <u>Vasquez</u>, 487 F.3d at 1246.  The court noted that "we have little guidance concerning what constitutes a primary effect of inhibiting religion" but that the most instructive cases in the Ninth Circuit were <u>Vernon</u> and <u>American Family Association</u>.  <u>Id.</u> at 1256.  In <u>Vernon</u>, the city investigated a police officer's religious beliefs in order to determine if he was performing his duties in violation of the Establishment Clause.  <u>Vernon</u>, 27 F.3d at 1397.  The officer claimed that the investigation had the primary effect of inhibiting or disapproving of his religion.  <u>Id.</u> at 1390.  The court held that:

> Notwithstanding the fact that one may infer possible city disapproval of [plaintiff's] religious beliefs from the direction of the investigation, this cannot objectively be construed as the primary focus or effect of the investigation.  The primary purpose of the government action was the investigation of any possible impermissible or illegal on-duty conduct of [plaintiff].  [The investigation could not] reasonably be construed to send as its primary message the disapproval of [plaintiff's] religious beliefs.

<u>Id.</u> at 1398-99.

Likewise, in <u>American Family Association</u>, the court held that a resolution condemning anti-gay advertisements put forth by a religious group, when "<u>read in context as a whole</u>, [was] primarily geared toward promoting equality for gays and discouraging violence against them . . . a reasonable, objective observer would view the primary effect of [the resolution] as encouraging equal rights for gays and discouraging hate crimes, and any statements from which disapproval can be

19

inferred only incidental and ancillary."  Am. Family Ass'n, Inc., 277 F.3d at 1122-23 (emphasis supplied).  Finally, in Vasquez, the court found that a reasonable observer would not perceive the primary effect of removing the cross from the LA County Seal as one of hostility towards religion.   Vasquez, 487 F.3d at 1257.

Thus, the question here is whether, when looking at the context as a whole, a reasonable observer would perceive the primary effect of Corbett's statements as disapproving of religion in general or of Christianity in particular.[11]  Put another way, the Court must consider whether it would be objectively reasonable for Corbett's statements to be construed as sending primarily a message of

---

[11]  In Brown, the Ninth Circuit considered the "vulnerable nature" of elementary school children, finding that the appropriate test was "whether an objective observer in the position of an elementary school student would perceive a message of . . . disapproval of Christianity."  Brown, 27 F.3d at 1378-79. Similarly, the Eleventh Circuit has found that "[i]n applying the Lemon test to a situation involving the public schools, the Court 'must do so mindful of the particular concerns that arise in the context of public elementary and secondary schools.'"  Smith, 827 F.2d at 689 (citation omitted).  Although Brown referred only to elementary school students, this Court will take into account that the present case involves high school students taking an AP course when applying the "reasonable observer" test.  The Court also notes that whether C.F. voluntarily took the course or not is irrelevant to the Establishment Clause claim.  In Brown, the court explained that "the opportunity to opt out does not cure any potential constitutional violation."  Brown, 27 F.3d at 1380 n.5.

disapproval.  Although the Court has carefully reviewed and considered all the relevant statements in the record in reaching a decision on this motion, the Court will only address certain statements in this written opinion, focusing on those statements referred to in Farnan's motion and in Farnan's Statement of Uncontroverted Facts ("SUF").

*The Peloza Comment*

The Court turns first to Corbett's statement regarding Peloza discussed above.  (<u>See</u> Farnan's Ex. I, pp. 222-25.)  The Court finds that Corbett's statement primarily sends a message of disapproval of religion or creationism.  As discussed above, Corbett states an unequivocal belief that creationism is "superstitious nonsense."  Corbett could have criticized Peloza for teaching religious views in class without disparaging those views.

*The Mark Twain Quote*

Next, the Court considers the Mark Twain quote.  Corbett stated, "What was it that Mark Twain said? Religion was invented when the first con man met the first fool." (Farnan's Ex. D, p. 75.)  When read in context, the primary effect of the comment was not to disapprove of religion.  A reasonable observer would not assume that Corbett was endorsing Twain's view of religion.

The primary effect of the balance of the statements relied upon by Farnan is not to disapprove of religion.

*"Jesus Glasses."*

21

First, the Court turns to the "Jesus glasses" phrase.  As discussed above, this phrase, standing alone, could be read as a general assertion disapproving of Christianity.  Even if one could infer disapproval of religion or Christianity, however, the comment only violates the Establishment Clause if the disapproval can be objectively construed as the primary focus or effect of the statement, read in context.

Here, the "Jesus glasses" comment is one sentence or phrase in the middle of a larger discussion about how religion may affect political choices and how it can be used as a manipulative tool.  Corbett was explaining that certain peasants did not support Joseph II's reforms for religious reasons, even though the reforms were in the peasants' best political and economic interests.  Corbett also seemed to make a general point that people sometimes make choices that are against their best interests for religious reasons and that religion has and can be used as a manipulative tool.

This context suggests that the phrase was primarily focused on and would be reasonably interpreted as primarily illustrating the specific historical point regarding the peasants and Corbett's point that religion can be misused.  Similarly, it appears that Corbett's referral to religion as "irrational" had the primary effect of demonstrating how religion can be used as a manipulative tool.[12]  (See Farnan's Ex. A, p. 24.)  It is not improper for an AP European History teacher to discuss

---

[12]  The Court notes that the term "irrational" is sometimes used to mean, simply, that which cannot be proven by generally accepted scientific methods, and does not necessarily mean "crazy" or "absurd," as it often does in common parlance.

how religion can intersect with social and political choices.

*Connection Between Religion and Morality.*

The Court turns to Corbett's comments regarding the connection between religion and morality.  Corbett made the following statement:

> Here's another interesting thing that just kind of – I'm not implying causality.  I'm just using correlation.  People in Europe who are least likely to go to church . . . are the Swedes.  The people in the industrialized world most likely to go to church are the Americans. America has the highest crime rate of all industrialized nations, and Sweden has the lowest.  The next time somebody tells you religion is connected with morality, you might want to ask them about that.

(Id. at 5.)

These statements cannot be reasonably construed as primarily disapproving of religion.  Corbett explicitly states that he is not drawing a causal connection but merely pointing out a correlation.  The statement that there is a correlation between church attendance and crime rates is an interesting sociological fact appropriate for a college level discussion and seems to only suggest disapproval of religion by way of speculation or inference.[13]

---

[13]  Whether Corbett's statements discussed throughout this opinion are factually true or not is irrelevant to the Court's analysis here and the Court does not opine on whether the statements are factually true.

*Views on Reproduction.*

On this topic, Corbett stated:

[C]onservatives don't want women to avoid pregnancies.  That's interfering with God's work.  You got to stay pregnant, barefoot, and in the kitchen and have babies until your body collapses.  All over the world, doesn't matter where you go, the conservatives want control over women's reproductive capacity.  Everywhere in the world.  From conservative Christians in this country to, um, Muslim fundamentalists in Afghanistan.  It's the same.  It's stunning how vitally interested they are in controlling women.

(Id. at 11.)

Corbett is primarily giving his opinion that women should have control over reproductive choices.  As discussed above, even if certain religious groups find Corbett's position on the political issue offensive or incorrect, there is no violation of the Establishment Clause.  The Court recognizes, however, that Corbett is also expressing disapproval of certain religious positions on the issue.  However, as in American Family Association, it seems that the statements from which disapproval can be inferred are only incidental and ancillary to Corbett's primary political point regarding reproduction.

*Connection Between Religion and Punishment.*

Farnan points to Corbett's discussion of the connection between religion and views on crime and punishment.  Corbett stated:

So we know what rehabilitation works and that punishment doesn't, and yet we go on punishing.  It really has a lot to do with these same culture wars we're talking about.  This whole Biblical notion: Sinners need to be punished.  And so you get massively more Draconian punishment in the South where religion is much more central to society than you do anyplace else.  And, of course, the Southerners get really upset, as what they see as lenient behavior in the North.  You know, we're going to solve this problem.  Except, guess what?  What part of the country has the highest murder rate?  The South.  What part of the country has the highest rape rate?  The South.  What part of the country has the highest (inaudible) church attendance?  The South.  Oh, wait a minute.  You mean there is not a correlation between these things?  No, there isn't.  Um, in fact, there is an inverse correlation.  In those places where people go to church the least, the crime was the most.  And that's not just Sweden and the United States.  That's Pennsylvania and Georgia.

(Id. at 23.)

A reasonable observer would view the above statements as being primarily geared towards expressing the view that rehabilitation works and punishment does not.  The Court recognizes that Corbett suggested his disapproval of religions or religious views that support punishment and argued that religious societies that focus on punishment do not effectively deter crime.  Corbett was stating a correlation between religion and a particular political view and then taking issue with that political stance.  The statements from which disapproval can be inferred are only incidental and ancillary, however, to Corbett's primary political point regarding crime and punishment.

25

*Scientific Reasoning and the Bible.*

Farnan points to several statements in which Corbett discussed the scientific revolution, scientific reasoning, and religion.  For example, Corbett stated the following:[14]

> Um, see, people believed before the scientific revolution that the Bible was literal and that anything that happened, God did it.  They didn't understand.  They didn't have the scientific method. They didn't approach truth.  The explanation to everything literally was that God did it.  And the ultimate authority, who was (inaudible). The ultimate authority was the Bible.  And, for example, you have (singing) Joshua fought the battle of Jericho . . . [b]ecause the sun stopped in the sky.  Well, if the Bible says the sun stopped, the sun must have stopped.  Of course, those Chinese astronomers who were watching the same sun didn't notice this phenomenon.  But if it's in the Bible, it must be true.. .So there you go.  They believe the Bible literally. . . . So, you know, understand that we have this sort of mindless centric notion, right? And these people didn't even know about it – get it out.  They didn't even know about the Western Hemisphere.  So they thought Jerusalem is in the center of the world.
>
> So – and presumably – and think how humbling it's going to be, you know, when all these people who have been talking about Adam and Eve and creation and all of this stuff for all that time when eventually

---

[14]  These statements were not made in the above order and were not necessarily made in the same discussions or lectures.

something happens, and they find out that there are people on another planet, six billion light years away, who don't look like us, worshiping huge geckos. . . . You have (inaudible) people who are deep believers and find out that maybe we're not so important.  Aristotle was a physicist.  He said, 'no movement without movers.'  And he argued that, you know there sort of has to be a God.  Of course that's nonsense.  I mean, that's what you call deductive reasoning, you know.  And you hear it all the time with people who say, 'Well, if all of this stuff that makes up the universe is here, something must have created it.'  Faulty logic.  Very faulty logic.

[T]he other possibility is it's always been here.  Those are the two possibilities: it [the universe] was created out of nothing or it's always been here.  Your call as to which one of those notions is scientific and which one is magic.  [Inaudible] the spaghetti monster behind the moon.  I mean, all I'm saying is that, you know, the people who want to make the argument that God did it, there is as much evidence that God did it as there is that there is a gigantic spaghetti monster living behind the moon who did it.

Therefore, no creation, unless you invoke magic.  Science doesn't invoke magic.  If we can't explain something, we do not uphold that position.  It's not, ooh, then magic.  That's not the way we work.

Contrast that with creationists.  They never try to disprove creationism.  They're all running around trying to prove it.  That's deduction.  It's not science.  Scientifically, it's nonsense.

27

(Farnan's Ex. D, pp. 71-75, 81.)

Even if one could infer religious disapproval from the above comments, a reasonable observer would find that the <u>primary</u> effect of Corbett's statements above was to distinguish generally accepted scientific reasoning from religious belief and to illustrate a historical shift from religious to scientific thinking.  For example, in the first paragraph above, Corbett explained that people once believed that the sun did not move in the sky because of a literal interpretation of the Bible. He then suggested that we have learned through scientific study that the sun does move through space.  He also explained that people once thought we were literally in the center of the Earth and were unaware that the Western Hemisphere existed. He stated that "they didn't approach truth," indicating that Corbett believes that the "truth" is that the sun is a moving object and that Jerusalem is not in the center of the Earth.[15]

In <u>Epperson</u>, 393 U.S. at 102-03, the Supreme Court struck down statutes forbidding the teaching of evolution in public schools, stating that the statutes were unconstitutional even if they merely prohibited teachers from stating that the theory of evolution is true.  This was so even though the theory was contrary "to the belief of some that the Book of Genesis must be the exclusive source of doctrine as to the origin of man." <u>Id.</u> at 107.  Here, Corbett not only indicated that the scientific principles were true, but also affirmatively suggested that the literal interpretation of the Bible was not true.  This goes one step beyond <u>Epperson</u> and could be construed as expressing affirmative disapproval of religious beliefs. Examining the full context of the discussion, however, a reasonable observer

---

[15]  Similarly, he suggested that someday certain religious groups may be "humbled" to discovery that we are not in the center of the universe.

28

would find that the statements had the <u>primary</u> effect of describing the secularization in thinking over time due to increasing belief in scientific principles.

In the next three paragraphs quoted above, Corbett discussed the difference between scientific reasoning and logical deduction and religious belief or faith. Again, although one could possibly infer that Corbett was advocating generally accepted scientific reasoning over religious belief or faith, a reasonable observer would not find that this was the primary effect of the discussion. For example, in discussing creationism, Corbett stated that "[s]cientifically, it's nonsense." Corbett did not say that he thinks creationism is nonsense but that generally accepted scientific principles do not logically lead to the theory of creationism. The Court recognizes, however, that common sense dictates that people of a certain religious faith may be offended by a comparison of their religion to "magic" and that this could be construed as being derogatory. Nevertheless, the Court cannot find that the primary effect of the lecture was to disapprove of religion.

Accordingly, the Court grants summary adjudication on the primary effect prong of the <u>Lemon</u> test against Corbett with regard to Peloza statement and in favor of the School Defendants and the Unions with regard to all other statements.

### 3.   Excessive Entanglement

The third prong of the <u>Lemon</u> test is satisfied if the challenged action does not foster an excessive government entanglement with religion. <u>Lemon</u>, 403 U.S. at 612-13.

Farnan correctly points out that "one of the factors we examine in determining whether excessive entanglement has occurred is whether the

29

challenged governmental action caused citizens to divide along political lines." Farnan Mot. p. 18; Vasquez, 487 F.3d at 1258.  Courts have found, however, that "[t]he political divisiveness doctrine generally is applied only in cases involving direct government subsidies to sectarian institutions."  Brown, 27 F.3d at 1383; see also Vernon, 27 F.3d at 1401, citing Lynch, 465 U.S. at 684 (O'Connor, J., concurring) (stating that the entanglement inquiry seems to be applied mainly in cases involving direct financial subsidies paid to parochial schools or to teachers in parochial schools).  This is not such a case.  Therefore, the Court finds that the political divisiveness doctrine does not demonstrate excessive entanglement.[16]

Farnan also argues that Corbett made statements in violation of the Establishment Clause which were continual and incessant and the School District "did nothing to lessen them."  (Farnan's Mot. p. 18.)  This Court agrees that the excessive entanglement prong generally requires some degree of ongoing entanglement.  In Vernon, for example, the Ninth Circuit found no excessive entanglement, explaining that the "plaintiff has presented no evidence at all to

---

[16] In addition, in American Family Association, the court explained that "[p]olitical divisiveness, however, has never been relied upon as an independent ground for holding a government practice unconstitutional."  Am. Family Ass'n, Inc., 277 F.3d at 1123 (internal citations quotations omitted).  The court further explained that if a government statement or action involving a controversial issue "were enough to create an Establishment Clause violation on entanglement grounds, government bodies would be at risk any time they took an action that affected potentially religious issues, including abortion, alcohol use, other sexual issues, etc."  Id.

suggest that the challenged government action will be ongoing and continuous."
<u>Vernon</u>, 27 F.3d at 1400.  The court cited <u>Walz v. Tax Commission of New York</u>,
397 U.S. 664, 674-75 (1970), which stated that "the questions are whether the
involvement is excessive, and whether it is a continuing one calling for official and
continuing surveillance."  In <u>Brown</u>, the court found no excessive entanglement,
noting that "no future monitoring" would be necessary.  <u>Brown</u>, 27 F.3d at 1384.

As discussed above, this Court has only found the Peloza statement violative
of the First Amendment.  Farnan might argue, however, that the deposition
testimony of Ryan Correll ("Correll") demonstrates a pattern of continued
statements which are hostile to religion.  Correll testified that he took Corbett's AP
Art History class in 2002-2003.  (Correll Depo., Farnan's Ex. S, p. 9.)  Correll
testified that Corbett stated "all you Christians can go to hell" during a class
period.  (<u>Id.</u> at 32-33.)  Correll further claimed that the statement was made in the
context of Corbett discussing "Christians and evangelism and, you know, people
trying to push their views on him . . . and his response to that."  (<u>Id.</u> at 33.)

The Court first notes that any statements made in the AP Art History class
are not themselves actionable in this case because Farnan, as the plaintiff in this
action, does not have standing as to those alleged statements.  In <u>Vasquez</u>, the
Ninth Circuit explained that the plaintiffs in another case "had standing because
they were directly affected by the laws and practices against which their
complaints [were] directed."  <u>Vasquez</u>, 487 F.3d at 1251 (citation and internal
quotations omitted).  Here, Farnan was not directly affected by Corbett's alleged
statements made to an Art History class in 2002-2003.

However, even if one finds Correll's testimony credible, that testimony
when combined with the Peloza statement is not sufficient to demonstrate ongoing,

31

excessive entanglement.

Accordingly, this Court grants summary adjudication in favor of the School Defendants and the Unions with respect to the excessive entanglement prong of the <u>Lemon</u> test.

C.      <u>The District's Liability</u>

Although the Court has found that one of Corbett's statements does not satisfy the first and second prongs of the <u>Lemon</u> test, it does not necessarily follow that the District is liable.  The parties spend little time discussing the District's liability in their briefs.  Farnan contends that the District failed to take action to prevent Corbett from making anti-religious statements.  (Farnan's Opp. p. 9.)  In the FAC, Farnan alleges that the District's continued employment of Corbett "convey[s] a governmental message that students holding religious beliefs are outsiders and are not full members of the community."  (FAC ¶ 24.)  However, Farnan has not presented sufficient evidence that the District conveyed such a message.  Nor has Farnan demonstrated that the District is liable pursuant to 42 U.S.C. § 1983.

Farnan has produced almost no evidence that the District was aware, prior to this action, that Corbett made any statements hostile to religion.  Tom Ressler ("Ressler"), the Principal at Capistrano Valley High School in 2007, testified that there was at least one complaint against Corbett by a parent which Ressler believed was lodged prior to this action.  (Ressler Depo. 26-29.)   Ressler stated that there could have been more complaints but he could not remember them.  (<u>Id.</u>)  Ressler did not testify, however, that the complaint had any connection to religion.  (<u>Id.</u>)  He merely explained that the complaint had to do with "the content of the class."

(Id.)  In addition, Ressler explained that he believed that the complaint came shortly before the filing of this lawsuit, stating that "[i]t was pretty close."  (Id.) Given that there is no evidence that this complaint pertained to religion and that the complaint apparently came shortly before the lawsuit was filed, the Court finds that it is not sufficient to demonstrate that the District knew of any anti-religious comments or that the District had time to take appropriate action prior to the filing of the lawsuit.

Farnan also points to the Declaration of Lynley Rosa ("Rosa"), whose son was enrolled in Corbett's AP European History class during the fall of 2007. (Rosa Decl. ¶ 4.)  Rosa declares that she spoke to her son's guidance counselor, expressing concerns regarding statements made by Corbett.  (Id. at ¶ 6.)  She was concerned because her son had told her that Corbett made statements "that reflected hostile attitudes concerning conservatives and Republicans."[17]  (Id. at ¶ 5.)

The failure to respond to the above complaints, one of which was not necessarily related to religion, is simply not sufficient to show that the District conveyed a message hostile to religion or failed to satisfy the three prongs of the Lemon test.  This is particularly true given that the Court has found that only one

_____

[17]  This is not hearsay because Rosa's testimony is offered to demonstrate that Rosa complained to the school about Corbett's comments and not as evidence that Corbett actually made the statements.  See Fed. R. Evid. 801.  Rosa's testimony about the guidance counselor's responsive comments, however, is hearsay because Rosa is testifying as to what the counselor said to prove the truth of the statements.  See id.; Rosa Decl. ¶ 6.

33

statement did not satisfy the <u>Lemon</u> test.  Thus, the District did not directly violate the Establishment Clause.

Nor can the District be held vicariously liable for Corbett's statement regarding Peloza under 42 U.S.C. § 1983.  "Liability under section 1983 arises only upon a showing of personal participation by the defendant.  There is no respondeat superior liability under section 1983."  <u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir. 1989) (citations omitted).  In addition "[a] supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them."  <u>Id.</u>  Rosa's complaint to the guidance counselor is not sufficient evidence that the District knew of comments hostile to religion.

Although the School Defendants and the Unions did not directly argue the above legal points regarding the District's liability, the Court finds that the relevant facts and legal issues have been adequately ventilated.  <u>See</u> <u>Cool Fuel, Inc. v. Connett</u>, 685 F.2d 309, 311-12 (9th Cir. 1982).  Thus, the Court grants summary judgment in favor of the District.

IV.    <u>CONCLUSION</u>

For the foregoing reasons, Farnan's motion for summary judgment is granted against Corbett with respect to the Peloza statement.  The School Defendant and the Unions' motions are granted with respect to all other statements and with respect to the District's liability.[18]

---

[18]    The Court need not address the Unions' Request for Judicial Notice.  The Unions submitted a copy of the CollegeBoard AP, European History Course

34

1
2
3

<u>Afterword</u>

4
5

This case reflects the tension between the constitutional rights of a student

6
and the demands of higher education as reflected in the Advanced Placement

7
European History course in which Farnan enrolled.  It also reflects a tension

8
between Farnan's deeply-held religious beliefs and the need for government,

9
particularly schools, to carry out their duties free of the strictures of any particular

10
religious or philosophical belief system.  The Constitution recognizes both sides of

11
the equation.

12
13

AP courses encourage and test critical thinking.  (Spradlin Decl. Ex. A, pp.

14
12, 19, 21& <u>passim</u>; pagination per exhibit.)  That necessarily involves conflict:

15
historical conflicts of many types, including conflicts between religion and

16
17
_____

18
Description in conjunction with the Declaration of Michael Hersh ("Hersh").

19
(Hersh Decl. ¶ 2, Ex. 1.)  Although the Declaration is not sworn and does not refer

20
to the penalty of perjury, the Court will nevertheless consider the Course

21
Description as evidence.  In addition, the Court need not address the School

22
Defendants' Objections to Plaintiff's Evidence because the Court did not rely on

23
the evidence objected to in reaching this decision.  Finally, the Court sustains

24
Farnan's Objection to Defendants' Reply to Plaintiff's Response to Defendants'

25
SUF.  Local Rules 56-1 and 56-2 do not authorize a party to submit a Reply to the

26
opposing party's SUF.

27
28

government or competing philosophical belief systems,[19] and conflicts in the classroom as teachers and students work through those historical conflicts, bringing their own thoughts and analysis to bear. Intellectual development requires discussion and critique of a wide range of views. The Court's ruling today reflects the constitutionally-permissible need for expansive discussion even if a given topic may be offensive to a particular religion or if a particular religion takes one side of a historical debate.

The decision also reflects that there are boundaries. In this case, the Court has found that a single statement transgresses Farnan's First Amendment rights. To entertain an exception for conduct that might be characterized as isolated or <u>de minimis</u> undermines the basic right in issue: to be free of a government that directly expresses disapproval of religion. The Supreme Court's comments with regard to governmental promotion of religion apply with equal force where the government disapproves of religion:

> [I]t is no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment. <u>The breach of neutrality that is today a trickling stream may all too soon become a raging torrent and, in the words of Madison, 'it is proper to take alarm at the first experiment on our liberties.</u>'

---

[19] <u>E.g.</u>, changes in religious thought and institutions; secularization of learning and culture; changes in elite and popular culture, such as the development of new attitudes toward religion, family, and work; changing definitions and attitudes toward social groups, classes, races, and ethnicities. (Spradlin Decl., Ex. A, pp. 12-13; pagination per exhibit.)

School Dist. of Abington, 374 U.S. at 225; see also Elk Grove Unified School Dist.
v. Newdow, 542 U.S. 1, 36-37 (2004) (O'Connor, J., concurring) (explaining that
"[t]here are no de minimis violations of the Constitution"); Lee v. Weisman, 505
U.S. 577, 594 (1992).[20]

The ruling today protects Farnan, but also protects teachers like Corbett in
carrying out their teaching duties.

DATED: May 1, 2009

_____
JAMES V. SELNA
UNITED STATES DISTRICT JUDGE

---

[20] Village Church v. Village of Long Grove, 468 F.3d 975, 995 (7th Cir.
2006), is not to the contrary.  The Seventh Circuit merely held that the third Lemon
prong, excessive entanglement, must be more than de minimis.  However, to pass
muster under Lemon, conduct must satisfy each prong of the test.  Here it does not.